Eastern District of Kentucky
FILED

AUG 2 0 2026

AT LEXINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**FRANKFORT**

**UNITED STATES OF AMERICA**

**V.** **INDICTMENT NO.** 26-11-KKC-MAS

**JACQUELINE DENISE SANDERS**

* * * * *

**THE GRAND JURY CHARGES:**

At all times relevant to this Indictment:

**BACKGROUND ON KENTUCKY MEDICAID PROGRAM**

1. The Kentucky Medicaid Program ("Medicaid") was a "health care benefit program," as defined by 18 U.S.C. § 24(b), that provided benefits to Kentucky residents who met certain eligibility requirements, including income requirements. Medicaid was jointly funded by federal and state sources and administered by the Centers for Medicare & Medicaid Services and by the Kentucky Cabinet for Health and Family Services, Department for Medicaid Services ("DMS"), located in Franklin County, Kentucky.

2. DMS contracted with Kentucky Medicaid Managed Care Organizations (MCOs) to administer the Medicaid program in Kentucky, and behavioral health service providers were required to be credentialed with those MCOs in order to receive reimbursements for the services they provided. During the period covered by this indictment, Medicaid contracted with multiple MCOs to administer its Medicaid program

and handle members' claims. Those MCOs included Anthem Blue Cross Blue Shield (Anthem), Passport Health Plan by Molina Healthcare (Passport), Aetna Better Health of Kentucky (Aetna), United Healthcare (UHC), WellCare of Kentucky (Wellcare), and Humana CareSource (Humana).

3. Individuals who qualified for Medicaid benefits were commonly referred to as "members," and as members, they were eligible to receive a variety of medical services.

4. Medicaid provided coverage to members for various behavioral-health-related services, including alcohol and drug treatment services, professional counseling, peer support services, psychiatry, psychotherapy, therapeutic behavioral health, and case management, in accordance with state regulations. Behavioral health service providers, meeting certain criteria, were eligible to enroll with Medicaid to provide Kentucky members with behavioral health services.

5. To enroll as a Medicaid service provider, providers were required to accurately complete and submit a MAP-811 Provider Application (MAP-811) enrollment form. The MAP-811 form required truthful disclosures, including but not limited to past criminal history for any owner with a controlling interest greater than five percent in the service provider and the following obligations and attestations:

a. assumption of the responsibility for appropriate, accurate, and timely submission of claims and encounter data whether submitted directly by the provider or by an agent;
b. use of electronic medical claims submittal procedures and record layouts as defined by Medicaid if submitting electronic claims;
c. presence of a provider's signature on the MAP-811 constituted compliance that the transmitted information was true, accurate and complete and any

subsequent correction altering the information contained would be transmitted promptly;

d. acknowledgement that claims would be paid using federal and state funds and that any false claims, statements, or documents or concealment of falsification of a material fact, may be prosecuted under applicable laws.

6. Medicaid relied on the accuracy of the MAP-811 and supporting documentation to determine whether a medical service provider was permitted to provide medical services and items to members.

7. Upon Medicaid enrollment, behavioral health service providers were permitted to provide behavioral health services and items such as peer support services, psychotherapy, therapeutic behavioral health, and targeted case management to Kentucky members. Behavioral health service providers could subsequently submit claims, either electronically or in hardcopy, to MCOs, through fiscal intermediaries, seeking reimbursement for services provided. Claims had to be submitted under a specific medical provider's National Provider Identifier ("NPI"). Approved claims were ultimately paid with funds authorized by DMS, located in Franklin County, in the Eastern District of Kentucky.

8. When seeking reimbursement from Medicaid, enrolled behavioral health service providers submitted the appropriate "procedure code," as defined by the American Medical Association, and set forth and maintained in the Current Procedural Terminology ("CPT") Manual or by the Healthcare Common Procedure Coding System ("HCPCS") for the services or items provided. Medicaid reimbursed behavioral health service providers designated amounts according to the CPT or HCPCS codes submitted, and the rates set forth in the then-current Medicaid fee schedule. The Medicaid fee

schedule was a list of fees that an MCO used to pay for authorized provider services and items.

9. The most common Medicaid procedure codes utilized by the behavioral health service providers covered in this Indictment included H2020 (therapeutic behavioral services), H0025 (self-help/peer support alcohol and/or drug prevention), H0038 (peer support services), T2023 (targeted case management), H2015 (comprehensive community support services), H2027 (psychoeducation), H0015 (intensive outpatient program), and 90837 (53+ minutes of psychotherapy services).

10. When seeking reimbursement from Medicaid for each billed code, behavioral health service providers certified that: (1) the contents of the claim forms were true, correct, and complete; (2) the claim forms were prepared in compliance with the laws and regulations governing Medicaid; and (3) the services provided, as set forth in the claim forms, were medically necessary.

11. Medicaid regulations stipulated that a service was medically necessary if, among other things, it was (a) based on an individualized assessment of the recipient's medical needs; (b) reasonable and required to identify, diagnose, treat, correct, cure, palliate, or prevent a disease, illness, injury, disability, or other medical condition; (c) appropriate in terms of the service, amount, scope, and duration based on generally accepted standards of good medical practice; and (d) provided for medical reasons rather than primarily for the convenience of the individual, the individual's caregiver, or the health care provider. 907 KAR 3:130, Section 2.

12. Medicaid required behavioral health service providers to maintain records for each member receiving services. 902 KAR 20:430. Medicaid regulations required this record to contain, among other items: (a) identifying information; (b) information on the purpose for seeking a service; (c) screening information pertaining to the mental health disorder; (d) staff notes on services provided; (e) a plan of care; (f) assigned therapists (if applicable); and (g) a termination study (if applicable) recapitulating findings and events during treatment, clinical impressions, and condition on termination. 902 KAR 20:430, Section 7(3). Member records were required to be maintained for six years after a member's discharge from treatment or death. 902 KAR 20:430, Section 7(5).

13. Medicaid required behavioral health service providers to conduct a screening of members to determine the likelihood of an individual having a mental health disorder, substance use disorder, or co-occuring disorder. Medicaid required behavioral health service providers to conduct an assessment for members who might have a mental health disorder requiring treatment. This assessment established or ruled out the existence of a clinical disorder or service need. The assessment included working with the individual member to develop a treatment and service plan and, if being made for the treatment of a substance use disorder, must have utilized a multidimensional assessment tool complying with the then-current American Society of Addiction Medicine ("ASAM") Criteria to determine the appropriate level of care. Screenings and assessments could only be conducted by a Kentucky-approved behavioral health practitioner as defined under 907 KAR 15:010, which did not include a peer support

specialist or a licensed clinical social worker under supervision. 907 KAR 15:010, Section 3(3)(a)-(b).

14. Behavioral health services organizations were required to establish an individual plan of care, signed by a behavioral health professional, for each Medicaid member receiving direct treatment. 902 KAR 20:430, Section 6(1); 907 KAR 15:020, Section 1(5). The plan was required to: (a) describe the services to be provided to the member, including the frequency of services; (b) contain measurable goals for the member to achieve, including the expected date of achievement for each goal; (c) describe the member's functional abilities and limitations, or diagnosis listed in the current edition of the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders; (d) specify each staff member assigned to work with the member; (e) identify methods of involving the member's family or significant others if indicated; (f) specify criteria to be met for termination of treatment; (g) include any referrals necessary for services not provided directly by the behavioral health services organization; and (h) state the date scheduled for review of the plan. 902 KAR 20:430, Section 6(2).

15. Medicaid regulations authorized reimbursement for peer support services, meaning emotional support provided by an adult peer support specialist to others with similar mental health, substance abuse, or co-occurring mental health and substance use disorders in order to achieve a desired social or personal change. Peer support services were structured and scheduled non-clinical therapeutic activities provided to an individual by an adult peer support specialist. Peer support specialists had to be trained

and registered with the Commonwealth of Kentucky. Peer support services had to be conducted face-to-face with the individual, provided in-person, and had to be provided under the supervision of a licensed professional, such a licensed clinical social worker. Peer support services not provided in accordance with these, and other regulations, would not be reimbursed by Medicaid.

16. Medicaid regulations prohibited reimbursement for any behavioral health services, including for the codes H2020, H0025, H0038, T2023, H2015, H2027, H0015, and 90837 cited above in paragraph 9, when a member was an inmate of a federal, state, or local jail, detention center, or prison. 907 KAR 15:010, Section 4.

17. A billable unit of service provided to Medicaid members was required to be actual time spent delivering a service in an encounter. Services were required to be stated in a recipient's plan of care and provided in accordance with a recipient's plan of care. 907 KAR 15:010, Section 1(4)(a)-(b).

## DEFENDANT AND RELEVANT ENTITIES

18. **JACQUELINE DENISE SANDERS** was a resident of Jefferson County, Kentucky, and owned and operated AA'S MEDICAL CODING AND BILLING SERVICES, LLC ("AA MEDICAL"). AA Medical billed Medicaid for dozens of behavioral health providers, including the following organizations and individuals.

19. BHP-1 was enrolled with Medicaid as a Behavioral Health Provider, effective January 1, 2021. BHP-2 was enrolled with Medicaid as a Licensed Clinical Social Worker Group, effective January 1, 2021. Co-Conspirator 1 ("CC-1") was a resident of Kentucky and owned and operated BHP-1 and BHP-2.

20. BHP-3 was enrolled with Medicaid as a Behavioral Health Provider, effective February 18, 2020. Co-Conspirator 2 ("CC-2") was a resident of Kentucky and North Carolina and owned and operated BHP-3. CC-2 was a Licensed Clinical Social Worker ("LCSW") and was enrolled as an individual Medicaid provider with an effective date of February 14, 2020. CC-2 contracted to provide LCSW professional services for BHP-1 and BHP-2.

21. BHP-4 was enrolled with Medicaid as a Behavioral Health Provider, effective July 1, 2019. Co-Conspirator 3 ("CC-3") was a resident of Kentucky and owned and operated BHP-4.

22. BHP-5 was enrolled with Medicaid as a Behavioral Health Provider, effective June 1, 2021. Co-Conspirator 4 ("CC-4") was a resident of Kentucky. CC-3 and CC-4 organized and operated BHP-5. **SANDERS** listed herself as an Owner of BHP-5 on the MAP-811 enrollment document.

23. BHP-6 was enrolled with Medicaid as a Behavioral Health Provider, effective June 1, 2019. BHP-7 was enrolled with Medicaid as a Behavioral Health Provider, effective July 26, 2021. BHP-6 and BHP-7 were owned and operated at various times by J.G. and J.H. **SANDERS** listed herself as an Owner of BHP-7 on the MAP-811 enrollment document.

24. BHP-8 was enrolled with Medicaid as a Behavioral Health Provider, effective April 1, 2021. BHP-8 was owned and operated by M.W. **SANDERS** listed herself as an Owner of BHP-8 on the MAP-811 enrollment document.

25. BHP-9 was enrolled with Medicaid as a Behavioral Health Provider, effective June 30, 2022. BHP-9 was owned and operated by P.S.

26. BHP-10 was enrolled with Medicaid as a Behavioral Health Provider, effective May 15, 2023. BHP-10 was owned and operated by CC-4.

## DEFENDANT'S SCHEME TO DEFRAUD

27. **SANDERS** and AA BILLING contracted with behavioral health providers to provide billing services with Medicaid. In addition, **SANDERS** assisted behavioral health providers with enrolling with Medicaid. Typically, **SANDERS** and AA BILLING charged behavioral health providers a fee of 7% of paid claims for their billing services.

28. **SANDERS** recruited individuals who were unfamiliar with Medicaid rules and regulations to become behavioral health providers and enroll with Medicaid.

29. **SANDERS** was heavily involved in setting up the practices of behavioral health providers, dictating what electronic health record service to use, directing what services should be billed, and dictating what medical documentation should be created. **SANDERS** handled all credentialing documents and provider applications for BHP-1, BHP-2, and BHP-4 through BHP-10, including filling out and submitting to Medicaid the Statement of Authorization for Payment, MAP-347 form, which authorized payment from Medicaid to the enrolled behavioral health provider.

30. **SANDERS** approached CC-1 about creating and enrolling BHP-1 and BHP-2 with Medicaid. **SANDERS** handled all the credentialing documents and billing information for BHP-1 and BHP-2. **SANDERS** introduced CC-1 and CC-2 and arranged a contract where CC-2 agreed to provide medical services for BHP-1 and BHP-2.

**SANDERS** and CC-1 knowingly caused BHP-1 and BHP-2 to bill fraudulently for services using CC-2's NPI number, when no legitimate Medicaid services had been performed at all, including instances when Medicaid members were incarcerated, hospitalized, or deceased at the time the services were ostensibly rendered.

31. **SANDERS** contracted with CC-2 to provide billing services for BHP-3. **SANDERS** and CC-2 knowingly caused BHP-3 to bill fraudulently for services when no legitimate Medicaid services had been performed at all, including instances when Medicaid members were incarcerated, hospitalized, or deceased at the time the services were ostensibly rendered.

32. **SANDERS** provided billing services for BHP-4 and BHP-5. **SANDERS**, CC-3, and CC-4 knowingly caused BHP-4 and BHP-5 to bill fraudulently for services using the NPI numbers of health care providers who had not treated the patients and had not authorized the use of their NPI numbers, and knowingly caused BHP-4 and BHP-5 to fraudulently bill for services when no legitimate Medicaid services had been performed at all, including instances when Medicaid members were incarcerated or hospitalized at the time the services were ostensibly rendered.

33. **SANDERS** recruited health care providers to participate in fraudulent billing schemes at behavioral health providers for which AA BILLING performed the billing, including BHP-1 through BHP-10. Advanced Practice Registered Nurses ("APRNs") K.M. and J.G-W. were recruited to provide services to BHP-4 and BHP-5. APRNs K.M. and J.G-W. treated a few dozen patients at those entities. Without authorization, **SANDERS** and AA BILLING continued to bill Medicaid for services

under the APRNs' NPI numbers at BHP-4 and BHP-5 for thousands of claims and hundreds of members.

34. At BHP-1 through BHP-10, assessments required by Medicaid before members received treatment were either not conducted by enrolled Kentucky behavioral health practitioners or, at **SANDERS's** direction, were fabricated with boilerplate language related to member participation, symptoms, experiences, progress notes, and diagnoses. Similarly, although required by Medicaid, individualized care plans meeting the regulatory requirements for Medicaid members were not created by the staff at BHP-1 through BHP-10.

35. At **SANDERS's** direction, BHP-1 through BHP-10 fraudulently billed for six or eight continuous hours of treatment for members on consecutive days, regardless of the severity of the Medicaid members' diagnoses and regardless of what services the underlying medical records indicated were provided.

36. J.G. formed BHP-6 and hired J.H. to be the clinical director. At **SANDERS's** suggestion, J.G. and J.H. later formed BHP-7 ostensibly to provide intensive outpatient services to patients, with J.H. as clinical director. **SANDERS** enrolled both BHP-6 and BHP-7 with Medicaid and handled all the billing services for both behavioral health providers. For BHP-6 and BHP-7, **SANDERS** decided which billing codes to submit to Medicaid, submitted all credentialing documents, and decided which electronic medical record system to use. **SANDERS** knowingly caused BHP-6 and BHP-7 to bill fraudulently for services when no legitimate services had been performed at all, including, for BHP-7, instances when Medicaid members were

incarcerated or hospitalized at the time the services were ostensibly rendered, and fraudulently billed for six or eight continuous hours of treatment for members on consecutive days, regardless of the severity of the Medicaid members' diagnoses and regardless of what services the underlying medical records indicated were provided.

37. For a limited period, J.H. authorized the use of her NPI at BHP-8, and BHP-9, as a billing supervisor. Without authorization, **SANDERS** and AA BILLING billed Medicaid for services under J.H.'s NPI numbers at BHP-8 and BHP-9, for services not provided or supervised by J.H. In addition, **SANDERS** and CC-4 listed J.H. as a provider for BHP-10 and fraudulently billed for services not performed by J.H.

38. Between January 1, 2020, and December 31, 2025, **SANDERS** and AA BILLING caused Medicaid to pay tens of millions of dollars for fraudulent and unauthorized claims.

39. Between May 1, 2021, and September 15, 2023, **SANDERS**, CC-1, and CC-2 caused $5,610,534 in fraudulent Medicaid reimbursement payments to be paid to BHP-1. Between April 26, 2021, and June 19, 2023, **SANDERS**, CC-1, and CC-2 caused $3,585,048 in fraudulent Medicaid reimbursement payments to be paid to BHP-2. Between March 18, 2020, and November 4, 2023, **SANDERS**, CC-1, and CC-2 caused $12,014,290 in Medicaid reimbursement payments to be paid to BHP-3, some of which was for fraudulent and unauthorized claims. Between January 1, 2020, and January 3, 2024, **SANDERS**, CC-3, and CC-4 caused Medicaid to pay $2,492,520 to BHP-4 and $9,052,728 to BHP-5 for fraudulent and unauthorized claims. Between January 3, 2020, and May 9, 2024, **SANDERS** caused $779,818 in Medicaid reimbursement payments to

be paid to BHP-6 and $10,769,699 to be paid to BHP-7, some of which was for fraudulent and unauthorized claims. Between June 3, 2021, and February 17, 2024, **SANDERS** caused $2,207,449 in Medicaid reimbursement payments to be paid to BHP-8, some of which was for fraudulent and unauthorized claims. Between December 5, 2022, and September 22, 2024, **SANDERS** caused $3,834,793 in Medicaid reimbursement payments to be paid to BHP-9, some of which was for fraudulent and unauthorized claims. Between August 1, 2023, and December 31, 2025, **SANDERS** and CC-4 caused $5,888,854 in Medicaid reimbursement payments to be paid to BHP-10, some of which was for fraudulent and unauthorized claims.

40. Between January 1, 2020, and June 8, 2026, **SANDERS** and AA Billing received at least $3,629,195 in payments from BHP-1 through BHP-10 for her fraudulent billing services. **SANDERS** used the proceeds on luxury goods, plastic surgery, jewelry, travel, real estate in Florida, and luxury vehicles.

## COUNT 1
**18 U.S.C. § 1349**
***Conspiracy to Commit Health Care Fraud***

41. Paragraphs 1-40 are re-alleged and incorporated by reference as if fully set forth herein.

42. Beginning in or around January 2020 and continuing through at least in or around June 2026, in Franklin County, in the Eastern District of Kentucky, and elsewhere,

**JACQUELINE DENISE SANDERS**

knowingly, with the intent to further the objects of the conspiracy, agreed and conspired

with others to commit the crime of health care fraud, that is, to knowingly and willfully execute a scheme to defraud health care benefit programs affecting commerce, as defined by 18 U.S.C. § 24(b), that is, Medicaid, and other health care benefit programs, and to obtain money and property owned by, and under the custody of Medicaid and other health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, by means of false and fraudulent pretenses, in violation of 18 U.S.C. § 1347.

43. The manner and means by which the Defendant sought to accomplish the purpose of the conspiracy included, among others, the conduct set forth in Paragraphs 27 through 40 of this Indictment.

All in violation of 18 U.S.C. § 1349.

**<u>COUNTS 2-26</u>**
**18 U.S.C. § 1347**
**18 U.S.C. § 2**
***Health Care Fraud***

44. Paragraphs 1-40 are re-alleged and incorporated by reference as if fully set forth herein.

45. Beginning in or around January 2020 and continuing through at least in or about December 31, 2025, in Franklin County, in the Eastern District of Kentucky, and elsewhere,

**JACQUELINE DENISE SANDERS**

knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in 18 U.S.C.

§ 24(b), that is Medicaid and other health care benefit programs, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the control of Medicaid and Medicaid MCOs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of 18 U.S.C. § 1347.

46. Specifically, on or about the claim dates listed below, in the Eastern District of Kentucky, and elsewhere, **SANDERS** executed and attempted to execute the scheme described above by submitting and causing the submission of claims for reimbursement as set forth below – each Medicaid beneficiary constituting a separate count of this Indictment. The claims for payment were submitted for services either not performed or not authorized by Medicaid regulation, or both.

| Count | Provider | Medicaid Member's Initials | Medicaid Number | Alleged Service Dates | Service Code Billed | Date of Claims |
|---|---|---|---|---|---|---|
| **2** | BHP-1<br>BHP-3 | C.S. | *1926 | 8/21/2022 – 9/2/2022 | H2020 | 9/21/2022 |
| **3** | BHP-3 | M.B. | *7391 | 9/5/2021 – 10/15/2021 | H0038 | 1/26/2022 |
| **4** | BHP-3 | M.P. | *1346 | 4/4/2021 – 4/7/2021 | 90837 | 1/5/2022 |
| **5** | BHP-3 | S.G. | *8871 | 8/14/2022 – 8/16/2022 | 90837 | 9/21/2022 |
| **6** | BHP-3 | M.S. | *7661 | 3/28/2022 – 3/30/2022 | H0038 | 4/13/2022 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **7** | BHP-1<br>BHP-3 | J.G. | *7391 | 9/12/2022 –<br>9/16/2022 | H2020 | 9/27/2022 |
| **8** | BHP-1<br>BHP-3 | B.F. | *8881 | 2/28/2022-<br>3/13/2022 | H2020 | 3/23/2022 |
| **9** | BHP-1<br>BHP-2 | B.C. | *9721 | 9/7/2021 –<br>9/12/2021 | H0038 | 9/22/2021 |
| **10** | BHP-4 | D.R. | *5391 | 9/11/2023 | H2027 | 10/4/2023 |
| **11** | BHP-5 | D.R. | *5391 | 9/4/2023 –<br>9/8/2023 | H0038 | 10/4/2023 |
| **12** | BHP-5 | C.O. | *0881 | 6/20/2022 –<br>6/24/2022 | H0038 | 7/6/2022 |
| **13** | BHP-5 | C.O. | *0881 | 9/5/2022 | H0038 | 9/21/2022 |
| **14** | BHP-5 | Z.B. | *6721 | 9/26/2022 –<br>10/27/2022 | H0038 | 10/11/2022 |
| **15** | BHP-7 | J.B. | *7561 | 12/27/2022 | H0038 | 1/31/2023 |
| **16** | BHP-8 | D.B. | *7296 | 3/14/2023 | H0038 | 4/11/2023 |
| **17** | BHP-8 | D.B. | *7296 | 3/15/2023 –<br>3/17/2023 | H2020 | 4/11/2023 |
| **18** | BHP-8 | T.P. | *7816 | 7/29/2021 –<br>8/24/2021 | H0038 | 9/8/2021 |
| **19** | BHP-8 | T.P. | *7816 | 8/2/2021 –<br>8/23/2021 | H0015 | 10/13/2021 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **20** | BHP-8 | J.C. | *6211 | 11/3/2021 – 11/15/2021 | H0038 | 11/28/2021 |
| **21** | BHP-8 | J.T. | *0591 | 11/21/2021 – 12/8/2021 | H0038 | 2/10/2022 |
| **22** | BHP-8 | D.H. | *7831 | 7/29/2021 – 8/20/2021 | H0038 | 9/8/2022 |
| **23** | BHP-9 | B.R.F. | *3291 | 3/14/2023 – 3/17/2023 | H0038 | 4/7/2023 |
| **24** | BHP-9 | J.S. | *3281 | 4/10/2023 – 4/11/2023 | H0038 | 4/28/2023 |
| **25** | BHP-10 | D.R. | *5391 | 10/9/2023 – 10/13/2023 | H0038 | 11/1/2023 |
| **26** | BHP-10 | D.R. | *5391 | 10/13/2023 | H2020 | 11/1/2023 |

Each in violation of 18 U.S.C. §§ 1347 and 2.

**COUNT 27**
**18 U.S.C. § 1957**
***Money Laundering***

47. On or about August 13, 2022, in Franklin County, in the Eastern District of Kentucky, and elsewhere,

**JACQUELINE DENISE SANDERS**

knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000 and that was derived from specified unlawful activity that occurred in the Eastern District of Kentucky, that is, a conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, by issuing a check in the amount of $69,353.76 to Bill Collins Ford to purchase a 2022 Ford F-150 Vin #1FTEW1E85NFB99480, Title Issue

Date 9/28/22, all in violation of 18 U.S.C. § 1957.

**COUNT 28**
**18 U.S.C. § 1957**
***Money Laundering***

48. On or about October 21, 2022, in Franklin County, in the Eastern District of Kentucky, and elsewhere,

**JACQUELINE DENISE SANDERS**

knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000 and that was derived from specified unlawful activity that occurred in the Eastern District of Kentucky, that is, a conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, by issuing a check in the amount of $18,850 to Genesis Diamonds to purchase a Rolex Datejust 41mm Wimbledon w/ 18K gold and stainless steel watch, all in violation of 18 U.S.C. § 1957.

**COUNT 29**
**18 U.S.C. § 1957**
***Money Laundering***

49. On or about February 22, 2023, in Franklin County, in the Eastern District of Kentucky, and elsewhere,

**JACQUELINE DENISE SANDERS**

knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000 and that was derived from specified unlawful activity that occurred in the Eastern District of Kentucky, by a conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, that is, issuing a check in the amount of $52,815.50 to Maserati Capital to purchase a 2021 Maserati Levante VIN: ZN661XUL5MX370845, all

in violation of 18 U.S.C. § 1957.

**COUNT 30**
**18 U.S.C. § 1957**
***Money Laundering***

50. On or about April 12, 2023, in Franklin County, in the Eastern District of Kentucky, and elsewhere,

**JACQUELINE DENISE SANDERS**

knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000 and that was derived from specified unlawful activity that occurred in the Eastern District of Kentucky, that is, a conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, by wiring $363,279.55 to Michael J Belle PA to purchase real property located at 2400 Feather Sound Drive 636, Clearwater, FL 33762, all in violation of 18 U.S.C. § 1957.

**FORFEITURE ALLEGATION**
**18 U.S.C. § 982(a)(1)**
**18 U.S.C. § 982(a)(7)**

51. By virtue of the commission of the offenses alleged in Counts 1 through 26 of this Indictment, **JACQUELINE DENISE SANDERS** shall forfeit to the United States any and all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the violations of 18 U.S.C. §§ 1347 and/or 1349. Any and all interest that **JACQUELINE DENISE SANDERS** has in this property is vested in and forfeited to the United States pursuant to 18 U.S.C. § 982(a)(7).

52. By virtue of the commission of the offenses alleged in Counts 27 through 30 of this Indictment, **JACQUELINE DENISE SANDERS** shall forfeit to the United

States any and all property, real or personal, involved in the violations of 18 U.S.C. § 1957 and any property traceable to such property. Any and all interest that **JACQUELINE DENISE SANDERS** has in this property is vested in and forfeited to the United States pursuant to 18 U.S.C. § 982(a)(1).

53. The property to be forfeited includes, but is not limited to, the following:

**PERSONAL PROPERTY:**
Rolex Datejust 41mm Wimbledon watch with 18K gold and stainless steel.

**VEHICLES:**
a. 2022 Ford F-150 with VIN 1FTEW1E85NFB99480; and
b. 2024 BMW X3 with VIN WBX57DP08RN256212.

**MONEY JUDGMENT:**
A forfeiture money judgment in the amount of proceeds obtained by the Defendant as a result of the violations of 18 U.S.C. §§ 1347 and 1349 alleged in this Indictment and/or representing the value of the property involved in the violations of 18 U.S.C. § 1957 alleged in this Indictment.

54. If any of the property listed above, as a result of any act or omission of the Defendant, (A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty, the United States shall be entitled to forfeit substitute property pursuant to 21 U.S.C. § 853(p).

A TRUE BILL

[redacted]

JASON D. PARMAN
FIRST ASSISTANT UNITED STATES ATTORNEY

KATE K. SMITH
ASSISTANT UNITED STATES ATTORNEY

# PENALTIES

| | |
|---|---|
| COUNTS 1-30: | Not more than 10 years imprisonment, a fine of not more than $250,000 or the greater of twice the gross gain or twice the gross loss, and supervised release for not more than 3 years. |
| PLUS: | Mandatory special assessment of $100 per count. |
| PLUS: | Forfeiture, as alleged. |
| PLUS: | Restitution, if applicable. |